NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220350-U

NO. 4-22-0350

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 5, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Knox County |
| Petitioner-Appellee, | ) | No. 18JA51 |
| v. | ) | |
| Sharee W., | ) | Honorable |
| Respondent-Appellant). | ) | Curtis S. Lane, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding the trial court did not err in entering a
default judgment against respondent in the fitness hearing, nor did the court err in
terminating respondent's parental rights.

¶ 2    In December 2018, the State filed a petition for adjudication of wardship with

respect to K.S., the minor child of respondent, Sharee W. (Mother or Sharee W.), alleging K.S.

was neglected and living in an environment injurious to his welfare. In March 2019, the trial

court adjudicated the minor neglected, made him a ward of the court, and placed custody and

guardianship with the Illinois Department of Children and Family Services (DCFS). The State

filed a petition to terminate respondent's parental rights in April 2021. When the respondent

failed to appear at the January 2022 fitness hearing, the trial court entered a default judgment

against her, thereby finding her an "unfit person" within the meaning of section 1(D) of the

Adoption Act (750 ILCS 50/1(D) (West 2020)). Respondent appeared for the best-interest

hearing in March 2022, but she did not move to set aside the default judgment. The court eventually found it was in the minor's best interest to terminate respondent's parental rights.

¶ 3 On appeal, respondent argues the following: (1) the trial court erred in entering a default judgment against her at the fitness hearing, (2) the trial court's unfitness findings stand against the manifest weight of the evidence, and (3) the trial court erred in terminating her parental rights. We affirm.

¶ 4 I. BACKGROUND

¶ 5 On December 28, 2018, the State filed a juvenile petition with respect to K.S. (born November 18, 2009), alleging the child was neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)), because he lived in an environment injurious to his welfare when in the care of his father and step-mother, who are not parties to this appeal. After a contested shelter care hearing, where the trial court found K.S. neglected and also found immediate and urgent necessity for a temporary custodian, the trial court placed temporary custody and guardianship of K.S. with DCFS. Though named in the petition, Mother did not appear or participate in the proceedings for more than a year.

¶ 6 As it relates to this particular matter, K.S. came to DCFS's attention on or about November 1, 2018, when it received a report that the home K.S. lived in with his father, step-mother, half-siblings, and step-brother had no electricity and received power from an extension cord plugged into the neighboring home. The report also alleged the children were dirty, ill-fed, and unsupervised. When DCFS visited the home, it was cluttered with clothes, trash, and tools. It was dirty and had cockroaches. When DCFS spoke with K.S.'s father and step-mother, they said the home was cluttered because the family was preparing to move, and

they had plans to hire an exterminator for the bugs. After receiving two more reports with similar allegations of environmental neglect, DCFS established a safety plan whereby K.S. and the other children would live elsewhere while the parents rectified the problems with their home. On December 26, 2018, DCFS learned K.S.'s father and step-mother violated the safety plan, and it took protective custody of K.S. and his siblings.

¶ 7                              A. Adjudicatory Proceedings

¶ 8              After several failed attempts to serve Mother with the juvenile petition dated December 28, 2018, the State served Mother via publication in February 2019. She did not appear at the adjudicatory hearing on March 26, 2019, where the trial court found, by a preponderance of the evidence, K.S. was neglected due to an injurious environment.

¶ 9              The trial court held a dispositional hearing on May 21, 2019, where the State introduced, without objection, the integrated assessment and a DCFS report the trial court admitted into evidence. The May 2019 integrated assessment documented the following regarding Mother:

> "[Sharee W.] (biological mother to [K.S.]) is not a
> perpetrator of abuse/neglect in this particular DCFS case.
> However, she has a history of DCFS involvement and does not
> have her parental fitness. [K.S.] was placed in his father's care by
> DCFS in November 2018. [Sharee W.] has not visited with [K.S.]
> since December 2018 with the exception of contact by phone.
> [Sharee W.] is not participating in services regarding her own
> DCFS case (SCR# 2308136B – 12/04/17). She has not returned
> phone calls or responded to letters sent by the Permanency

Worker. For this reason, she was not interviewed."

The assessment confirmed Sharee W. had a prior indicated finding of neglect (substantial risk of physical injury/environment injurious to health and welfare by neglect) relating to K.S. Based on information from a collateral source, the assessment noted Sharee W. suffered various mental illnesses and abused substances. She attempted suicide in March 2019 and was hospitalized for a few days. Considering the reports, the trial court found Mother "unfit, unwilling, and unable to care for, protect, or—or take care of [K.S.], and it's in the best interests of [K.S.] to be made [a] ward[ ] at this time in light of the fact that the mother[ ] [has] failed to cooperate to this point." Besides documenting these findings, the trial court's dispositional order adjudicated K.S. neglected, made him a ward of the court, and instructed DCFS to maintain custody and guardianship.

¶ 10　　　　The trial court held permanency review hearings on October 22, 2019, and June 16, 2020. Sharee W. failed to appear at the October hearing, but she attended the June hearing—her first appearance in this matter. The trial court recounted how Sharee W. was served by publication and defaulted via the adjudication order. The court then appointed Sharee W. the same counsel she had representing her in her other DCFS case. The State provided Sharee W. with a copy of the DCFS report and a copy of the juvenile petition.

¶ 11　　　　Sharee W., however, failed to appear at the next permanency review hearing on August 4, 2020. When asked if Sharee W. had a position on the goal of returning home, her counsel took no position, noting he represented Sharee W. "on a couple other matters, and she's been sporadic with her appearances and me having any communication with her." Citing the parents' noncompliance and failure to make reasonable progress in the first nine-month period, the trial court changed the goal from K.S. returning home to substitute care pending court

determination on termination of parental rights. Concerning Mother, the trial court observed: "[Sharee W.] didn't show up ever in this proceeding except for the last hearing, and I think she was only here randomly because she has other abuse/neglect cases pending, frankly. I don't believe these parents have any interest in achieving the goals of the service plans or making any efforts to even do that."

¶ 12        Mother appeared at the next permanency review hearing on October 13, 2020. Counsel for K.S.'s father moved for a continuance, which the trial court denied. Noting the parents' noncompliance, the length of the case, and the fact that Sharee W. "doesn't even show up to all of her hearings that are pending in front of this Court," the trial court opined, "[t]hese children need permanence." Sharee W. presented no evidence, but her attorney informed the court she had scheduled appointments for mental health and substance evaluations for October 15. Sharee W. had also started a parenting class. Her counsel objected to a finding Mother had not made reasonable efforts. The trial court determined Sharee W. had failed to make reasonable efforts or progress, it maintained the status quo, and it ordered Sharee W. to comply with services and cooperate with DCFS.

¶ 13                  B. Termination of Respondent's Parental Rights

¶ 14        On April 1, 2021, the State filed a petition to terminate Sharee W.'s parental rights to K.S. The State alleged Sharee W. was an unfit person pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). The State's petition identified three counts: (1) Sharee W. has failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any nine-month period following the adjudication of neglect, specifically the time frame from January 13, 2020, through October 13, 2020 (750 ILCS 50/1(D)(m)(i) (West 2020)); (2) Sharee W. has failed to make reasonable

progress toward the return of the child to the parent during any nine-month period following adjudication of neglect, specifically the nine-month period between January 13, 2020, through October 13, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2020)); and (3) Sharee W. has failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2020)). The State's petition further contended termination of Mother's parental rights served the child's best interest and asked for custody and guardianship to remain with DCFS, giving it the authority to consent to the child's adoption. In a May 4, 2021, hearing where Sharee W. failed to appear, her attorney entered general denials on the petition's allegations. On July 12, 2021, the State served Sharee W. with the petition and summons while she was housed in the Knox County jail.

¶ 15        On November 9, 2021, Sharee W. and her counsel appeared in court for the scheduled fitness hearing. However, other necessary parties were not present due to illness. The trial court continued the hearing on its own motion, finding "good cause given the pandemic that we are in." The trial court then addressed the parties, saying:

> "[T]his case will be continued to January 11th of 2022 at 3:00
>
> p.m., okay? So that is your next court date for everyone.
>
>     Although, the moms and dads, stay in touch with your
>
> attorneys. They will be given notice of this date, and we will
>
> proceed with fitness hearing at that date and time."

A notice of hearing was mailed to Mother on November 15, 2021.

¶ 16        The parties reassembled before the trial court for a fitness hearing on January 11, 2022. Sharee W., however, failed to appear, though her attorney was present. Because K.S.'s father had been appointed a new attorney that very day, the trial court yet again continued the

fitness hearing to January 20 at 1:45 p.m. But before the trial court adjourned, the State moved for a default judgment as to fitness for Sharee W., arguing it had served her the termination petition via publication in October 2021 and she has routinely failed to appear in court. The trial court reserved judgment on the matter until the next hearing. A notice of hearing was mailed to Sharee W. the next day.

¶ 17    On January 20, 2022, the trial court held the fitness hearing on the State's petition to terminate parental rights. Sharee W. failed to appear, but her counsel was present. The State renewed its motion for default judgment against Sharee W. The guardian *ad litem* (GAL) supported the State's motion. Mother's counsel informed the court: "I've had no communication with my client since September." The court responded: "Okay. So Mom, Sharee [W.], will be defaulted for fitness purposes." Sharee W.'s attorney then "ask[ed] for permission of the Court to withdraw on this motion." With no objections from the other parties, the trial court allowed Mother's counsel to withdraw. The court then proceeded to hear evidence pertaining to the other parents from the children's caseworker, Tara Wilder. Wilder did not testify regarding Sharee W.

¶ 18    The trial court's order reflected, by interlineation, the default judgment as to Sharee W.'s fitness, citing her failure to appear. However, the order also contained three unfitness findings, determining that between January 13, 2020, and October 13, 2020, Sharee W. failed to make reasonable efforts or reasonable progress toward K.S. returning to her care and she failed to maintain a reasonable degree of interest, concern, or responsibility for K.S.'s welfare. The order noted: "The Respondent mother is adjudicated an unfit person as to the minor, [K.S.]"

¶ 19                    C. Best-Interests Determination

¶ 20    On March 29, 2022, the trial court held the best-interest hearing on the State's

petition to terminate parental rights. Sharee W. appeared with her attorney. The State moved to introduce DCFS's best-interest report, which the trial court admitted without any objection. The report noted Sharee W. had been found to be an unfit parent to K.S. It documented she had been noncompliant with services and uncooperative with DCFS. According to the report, Sharee W. had not maintained housing or income, and she had "not visited with [K.S.] consistently for the duration of this case." The best-interest report noted K.S. was 12 years old and had been in foster care with his grandparents for 1148 days. His grandparents meet K.S.'s needs for food, clothing, shelter, and safety. They provide structure and consistency for K.S., they help him with schoolwork, and they engage him in extracurricular activities he enjoys. K.S. did well in school with an individualized education plan (IEP). He has friends at school and in the community. The best-interest report noted K.S. "is bonded with his grandparents and does well in their home." It likewise noted K.S. loved Sharee W., he shared a bond with her, and he expressed wishes that he could someday return to her home.

¶ 21 The State called Tara Wilder, a DCFS child welfare specialist, as a witness. She testified she was familiar with K.S. because she was his caseworker. She stated Sharee W. was K.S.'s biological mother. Wilder testified it was in K.S.'s best interest to terminate Sharee W.'s parental rights. She noted Sharee W. did not complete her service plan. Wilder testified K.S. lived with his grandparents and he was safe, stable, healthy, and happy. She noted K.S. had his own room in the home. She testified K.S.'s younger half-brother also lived in the home. He saw his other siblings once a month. Wilder testified K.S. was bonded to his grandparents and he thrived in their home. She noted K.S. did well in school and had friends. Wilder testified the grandparents were willing to provide K.S. permanence.

¶ 22 On cross-examination, Wilder described Sharee W.'s visits with K.S. as "[f]ine."

Sharee W. "parents well during her visitation" and Wilder had no concerns during visits. Wilder testified K.S. is happy to see his mother. Sharee W. sometimes brought gifts or snacks to the visits. Wilder testified Sharee W.'s "visitation kind of goes in waves," explaining "[s]he has periods where she's consistent and then kind of falls off and then comes back." Wilder noted Sharee W. recently inquired about restarting video visits with K.S. Wilder testified that the grandmother offered Sharee W. "a phone call or something at Christmastime" with K.S., "but Sharee [W.] didn't want it."

¶ 23 On redirect examination Wilder testified Sharee W. had not visited with K.S. since July 2021. On examination from the court, Wilder noted Sharee W. was in jail now due to an outstanding warrant. Wilder, however, did not know why there was a warrant out for her arrest.

¶ 24 Sharee W. then testified. She acknowledged, "it's been, honestly, quite some time" since she saw K.S., though she said, "I've spoken with him off and on through Facebook, the telephone, small video chats here and there." Sharee W. testified she recently asked about having video visits with K.S. while she was incarcerated. She claimed she had been trying to resume visitation for some time, but her efforts were thwarted by Help at Home's change in supervisors and its failure to contact her. Sharee W. testified she messaged her caseworker to provide a current phone number, and she claimed she had no missed phone calls from DCFS or Help at Home. Sharee W. described her visits with K.S. as "really good" and "[h]e is super excited." She said they talk about music, school, and friends. She confirmed she got gifts for K.S.

¶ 25 Sharee W. testified she attempted to work on her service plan. She said she had been scheduled to restart parenting classes in July 2020, but she was arrested in June. Sharee W.

testified she had previously started parenting classes and almost completed them. She stated she was interested in completing her service plan. She noted her attitude changed since the case began. Sharee W. explained:

"I know—in the beginning it was really hard for me. I—I kind of—I want to say I stomped my feet. I threw a fit because I was charged with something that I didn't do, and I felt like, you know, I didn't do what I was accused of. Now I understand. You know, I'm coming to the understanding that, granted, I didn't do what I was accused of, but I still have to work the case plan. I still have to do what is expected to be done to get them back, even though I didn't do what I was accused of, if that makes sense."

She testified she paid child support when she could, but she did not have a job. Sharee W. expressed her interest in having an ongoing relationship with K.S., even if her rights are terminated. She said she was willing to give up temporary custody of K.S. to her mother if she could retain her parental rights. When asked about her plan to get her life on track once she is released from jail, Sharee W. stated she planned to continue taking medication for her mental illness that she began taking while in jail, she said she would walk into Bridgeway to tell them she was on medication so they could get her in right away, and she would continue to attend narcotics anonymous (NA) meetings.

¶ 26        On cross-examination by the State, Sharee W. stated she had been in jail for several weeks. She explained she was incarcerated for failure to comply with the terms of her probation. She had been on probation following a drug conviction. Sharee W. again noted she lost custody of her children for something she did not do. She stated she addressed her mental

health problems through a phone interview and beginning medication when in jail.

¶ 27  On cross-examination by the GAL, Sharee W. addressed her missed visits. She attributed her inconsistent visits with K.S. to various factors, including: she was on the phone trying to schedule a mental health evaluation and her ride left her, the new visitation servicer, the weather, lack of help from DCFS and providers, and that it hurt to explain to K.S. why he was not living with her. When asked about her prior noncompliance, Sharee W. stated she did not participate in the case for almost three years because she believed "it was unfair" to have her "kids taken for something that [she] didn't do." Sharee W. testified she underwent drug screenings during her probation and tested positive for methamphetamine once in April 2019.

¶ 28  The trial court then examined Sharee W. on her failure to appear at the January 20, 2022, fitness hearing. Sharee W. testified: "I cannot recall where I was at. I was most likely at home on Pine Street." This exchange followed:

> "The Court: You don't have any idea why you wouldn't appear at a fitness hearing which potentially is going to roll into a termination of your parental rights?
>
> Sharee W: I was—to my knowledge, at this point in time right now, I was not notified of a fitness hearing.
>
> The Court: Okay. Your attorney didn't notify you?
>
> Sharee W: I'm not sure.
>
> The Court: Okay. Ma'am, is the only reason—that you're here today for this hearing is that you're in custody?
>
> Sharee W: No, sir.
>
> The Court: Okay. You would have appeared at this

- 11 -

hearing?

Sharee W:  Yes, sir.

The Court:  Okay. Were you notified by your attorney of this hearing?

Sharee W: Yes, your honor."

¶ 29　　On redirect examination, Sharee W. stated DCFS asked her only one time to do a drug test. She stated she did not do the test. She acknowledged she had not been to Bridgeway for substance abuse treatment, but she "used to go to a lot of NA meetings." She also confirmed that counsel had her correct phone number in November 2021, but her phone number had since changed.

¶ 30　　In reciting its decision into the record, the trial court first noted it "has taken into account the best interest report." The court stated it heard "a lot of testimony today about doing services," but it noted services related to fitness not best interest. The trial court explained:

"Fitness was done on January 20th of '22, which [Sharee W.] didn't even appear and blamed her attorney for not appearing. The Court asked [Sharee W.] if she would even be here today if she was not in custody. She claimed again Mr. Colburn apparently advised her of today, even though he was actually discharged as counsel after the last hearing. The Court doesn't believe [Sharee W.] would be here today if she was not in custody. The mother not only has a failure to appear throughout the history of the case when I handled this but also the fitness stage, which is very important. But, again, we're past the fitness."

The trial court observed, "None of the parents have stepped up," and, "[t]hese children are no closer to going home with these parents than they were when this case started." As for Sharee W., the court found she "isn't a return home candidate right now" because "[s]he's in custody." It also stated: "If you ask [Sharee W.], nothing is her fault." The trial court concluded:

> "[W]hen the case starts, it's about reunification with the parents; however, when we have cases like this, it shifts to a permanency of the children. The parents can't provide that permanency. I believe that the State has met their [*sic*] burden. It is in the best interests to terminate [the rights of] the parents."

The court ordered "[t]hat the parental rights of Sharee [W.] are terminated," DCFS "shall maintain guardianship of K.S.," and the permanency goal remain adoption.

¶ 31    This appeal followed.

¶ 32                                II. ANALYSIS

¶ 33    We initially comment on the delay in the issuance of this order. As a matter addressing the custody of the minor child, this case is subject to expedited disposition under Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), requiring the appellate court to issue its decision within 150 days after the filing of a notice of appeal, except for good cause shown. Mother filed her initial notice of appeal on April 20, 2022, and every effort was made to comply with the September 19 deadline under Rule 311(a)(5). However, procedural complexities precluded us from doing so, and we find good cause exists for the delay.

¶ 34    Respondent challenges the trial court's judgment on three grounds: (1) the trial court erroneously entered a default judgment against Sharee W. at the fitness hearing; (2) the trial court erred in finding Sharee W. unfit, specifically that she failed to make reasonable efforts

- 13 -

or progress toward K.S. returning to her home and she failed to maintain a reasonable degree of interest, concern, or responsibility as to K.S.'s welfare; and (3) the trial court erroneously terminated Sharee W.'s parental rights. We disagree and affirm the trial court's judgment.

¶ 35        The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2020)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person," and then the State must show terminating parental rights serves the best interest of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing 750 ILCS 50/1(D) (West 1998) and 705 ILCS 405/2-29(2) (West 1998)). Sharee W. challenges both the fitness and best-interest determinations, and we take each in turn.

¶ 36                        A. Unfitness Finding

¶ 37        " 'The State must prove parental unfitness by clear and convincing evidence.' " *In re A.L.*, 409 Ill. App. 3d 492, 500, 949 N.E.2d 1123, 1129 (2011) (quoting *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004)). The Adoption Act provides several grounds on which a trial court may find a parent "unfit," including: the parent's failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2020)); the parent's failure to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from the parent during any nine-month period following the adjudication of neglect or abuse or dependency under the Juvenile Court Act (750 ILCS 50/1(D)(m)(i) (West 2020)); and the parent's failure to make reasonable progress toward the return of the child to the parent during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii) (West 2020)). Despite

- 14 -

several potential bases for unfitness, "sufficient evidence of one statutory ground *** [is] enough to support a [court's] finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83, 19 N.E.3d 227; see also *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064, 859 N.E.2d 123, 135 (2006) ("A finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act." (citing *In re D.D.*, 196 Ill. 2d 405, 422, 752 N.E.2d 1112, 1122 (2001))).

¶ 38        This court pays " 'great deference' " to a trial court's finding " 'because of [that court's] superior opportunity to observe the witnesses and evaluate their credibility.' " *A.L.*, 409 Ill. App. 3d at 500 (quoting *Jordan V.*, 347 Ill. App. 3d at 1067). We "will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *A.L.*, 409 Ill. App. 3d at 500. Since " '[e]ach case concerning parental unfitness is *sui generis*, requiring a close analysis of its individual facts' " (*In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19, 980 N.E.2d 91 (quoting *In re Konstantinos H.*, 387 Ill. App. 3d 192, 203, 899 N.E.2d 549, 558 (2008), quoting *Daphnie E.*, 368 Ill. App. 3d at 1064)), we must focus our attention to the facts of this case.

¶ 39        Illinois law allows trial courts to enter default judgments against parents who fail to appear for proceedings held pursuant to the Juvenile Court Act when the parents had been properly served. 705 ILCS 405/2-21(1) (West 2020); see also Ill. S. Ct. R. 219(c) (eff. July 1, 2002); Ill. S. Ct. R. 237(b) (eff. Oct. 1, 2021); *In re B.C.*, 317 Ill. App. 3d 607, 612, 740 N.E.2d 41, 45 (2000). "However, a sanction causing a default judgment is proper only where the sanctioned [parent's] conduct showed 'deliberate, contumacious, or unwarranted disregard for the court's authority.' " *B.C.*, 317 Ill. App. 3d at 612 (quoting *In re D.R.*, 307 Ill. App. 3d 478, 482, 718 N.E.2d 664, 666 (1999)). We review a trial court's decision to enter a default judgment

against a parent for an abuse of discretion. *B.C.*, 317 Ill. App. 3d at 612. A court abuses its discretion when it rules arbitrarily or unreasonably. *D.R.*, 307 Ill. App. 3d at 482.

¶ 40                              1. *Default Judgment as to Fitness*

¶ 41        Sharee W. contends the trial court erred in entering a default judgment against her at the fitness hearing because her attorney was present and had previously entered denials on her behalf. We note, initially, that Sharee W. neither objected to the default judgment, nor did she seek to vacate the default judgment later pursuant to section 2-1301(e) of the Code of Civil Procedure (735 ILCS 5/2-1301(e) (West 2020)). Though she fails to cite the plain-error standard, Sharee W. argues, "[i]t was plain error for the Trial Court to enter default against Sharee [W.]" Under the plain-error doctrine, "[n]onpreserved errors may be reviewed on appeal if the evidence is closely balanced or where the errors are of such a magnitude that the defendant was denied a fair and impartial trial." *People v. Cox*, 377 Ill. App. 3d 690, 703, 879 N.E.2d 459, 473 (2007) (citing *People v. Nieves*, 192 Ill. 2d 487, 502-03, 737 N.E.2d 150, 158 (2000)). The first step of plain-error review is determining whether any error occurred. *People v. Walker*, 232 Ill. 2d 113, 124, 902 N.E.2d 691, 697 (2009).

¶ 42        Sharee W. directs our attention to *Reuben H. Donnelley Corp. v. Earles*, 268 Ill. App. 3d 263, 643 N.E.2d 1329 (1994), arguing, "[t]his case is substantially similar" and, therefore, merits the same result. There, the plaintiff sued the defendant for breach of contract and the defendant filed an appearance, answer, and jury demand. *Reuben H. Donnelley Corp.*, 268 Ill. App. 3d at 263. On the day of trial, witnesses and counsel for both parties appeared, but the defendant did not appear. The defendant's counsel tried to phone the defendant but could not reach him. *Reuben H. Donnelley Corp.*, 268 Ill. App. 3d at 263-64. The trial court asked defense counsel to waive the jury demand, but she declined. *Reuben H. Donnelley Corp.*, 268 Ill. App. 3d

- 16 -

at 263. On its own motion, the trial court defaulted the defendant, found the jury demand waived, and held a hearing on damages. *Reuben H. Donnelley Corp.*, 268 Ill. App. 3d at 264. The defendant appealed, arguing the trial court erred in entering a default judgment against him. Because he did not raise the issue in his posttrial motion, the appellate court reviewed the defendant's argument for plain error. *Reuben H. Donnelley Corp.*, 268 Ill. App. 3d at 264-65. The appellate court emphasized the defendant never received "[a] notice that a default judgment might be entered if [he] failed to appear." *Reuben H. Donnelley Corp.*, 268 Ill. App. 3d at 264. Noting the trial court's decision "undercut the fundamental fairness of the proceeding," the appellate court held: "When a defendant files an appearance and places in issue the allegations in the complaint, a trial court cannot enter a default judgment merely because defendant failed to appear at trial. Plaintiff must prove its claim as if defendant had been present to try the case." *Reuben H. Donnelley Corp.*, 268 Ill. App. 3d at 265.

¶ 43      Although Sharee W. likens her case to *Reuben H. Donnelley Corp.*, we see significant differences from this case that preclude a similar outcome. For example, contrary to the trial court in *Rueben H. Donnelley Corp.*, this trial court did not enter a default judgment *sua sponte*. Rather, the trial court acted on the State's two motions for a default judgment and even gave Sharee W. one more opportunity to appear before defaulting her on fitness. Furthermore, unlike the defendant in *Reuben H. Donnelley Corp.*, Sharee W. received multiple notices telling her that if she failed to appear to answer the State's termination petition, she "may lose all parental rights to this child and the child may be placed for adoption without any further notice to you." Yet nevertheless, this record is full of instances of Sharee W. not appearing for court proceedings. Of all the hearings the trial court held between December 2018 and January 2022, some 15 hearings, Sharee W. appeared for 3. Unlike *Reuben H. Donnelley Corp.*, this is

not an instance of Sharee W. merely failing to appear for trial when she had insufficient notice. Sharee W. was in court on November 9, 2021, when the trial court told her the fitness hearing would be rescheduled for January 11, 2022, at 3 p.m. The trial court also admonished her to "stay in touch" with her attorney. The State did mail her notice of the January 11 hearing and then the January 20 hearing when the prior hearing had to be continued again. This record confirms Sharee W. received notice and still missed nearly all court proceedings, including the fitness hearing. Given the factual differences and considering the *Reuben H. Donnelley Corp.* court's emphasis on notice, we find that case distinguishable and not dispositive here.

¶ 44      We observe *In re C.J.*, 2013 IL App (5th) 120474, ¶ 7, 985 N.E.2d 1045, a termination-of-parental-rights case, cites *Reuben H. Donnelley Corp.* for the proposition that when a parent files an appearance and denies the allegations in the petition, the trial court cannot enter a default judgment and the State "must prove the allegations of the petition as if the respondent [parent] had been present to try the case." For the following reasons, we are hesitant to adopt *C.J.*'s reasoning to hold the trial court erred in entering a default judgment here. First, the State conceded error in *C.J.* and requested remand for an evidentiary hearing. We have no such concession here. Next, perhaps due to the State's concession, *C.J.* does not cite, let alone analyze, the relevant statutory provisions relating to default judgments in termination proceedings. As we noted *supra*, Illinois law allows for trial courts to enter default judgments against parents who fail to appear. 705 ILCS 405/2-21(1) (West 2020); 735 ILCS 5/2-1301(d) (West 2020). Finally, *C.J.* neglects to discuss any caselaw governing termination of parental rights to surmise or even analyze if an evidentiary prove-up or factual basis is required for a default as it is for other admissions in juvenile matters. See generally *In re M.H.*, 196 Ill. 2d 356, 751 N.E.2d 1134 (2001).

¶ 45         Instead, we find this case more akin to *B.C.*, where DCFS took protective custody of respondent mother's seven children due to her substance abuse, her abandonment of them, and her poor parenting skills. *B.C.*, 317 Ill. App. 3d at 609. DCFS sought termination of the respondent's parental rights, and when the respondent did not appear for the hearing, the trial court granted the State's motion for sanctions. The trial court struck the respondent's answer, found her in default, and did not allow the respondent's attorney to present evidence, though counsel could cross-examine witnesses and give closing argument. *B.C.*, 317 Ill. App. 3d at 609. After the trial court terminated her parental rights, the respondent appealed, arguing the trial court's decision to find her in default deprived her of due process. *B.C.*, 317 Ill. App. 3d at 612. The reviewing court affirmed, noting, "respondent was only present at hearings when she happened to be in prison" and "finding respondent, or an address where she could be served, was a continual problem throughout the proceedings." *B.C.*, 317 Ill. App. 3d at 613. The reviewing court further noted how the trial court did not impose sanctions as punishment but as a means of moving an old, slow-moving case along for the ends of permanence for the children. The court noted, again, "that respondent had 'a history of failing to come in and engage with her lawyer unless she was brought in on a writ.' " *B.C.*, 317 Ill. App. 3d at 614. Ultimately, the reviewing court affirmed, noting: "Given the circumstances of the present case, we do not find that the trial court's sanctions represent an abuse of discretion." *B.C.*, 317 Ill. App. 3d at 614.

¶ 46         Like the *B.C.* court, we must consider the particular circumstances before us. See *B.C.*, 317 Ill. App. 3d at 614; *Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19. Here, as in *B.C.*, we have a mother who repeatedly failed to appear for juvenile proceedings and seemingly only appeared when she was in custody or happened to be in the courthouse for other matters. For example, her *first* appearance in the case at the June 16, 2020, permanency review hearing

- 19 -

(nearly 18 months after the shelter care hearing) resulted from her being in the courthouse for her other DCFS matter. Despite diligence from DCFS and the State to locate Sharee W., provide her notice, and keep her involved in the case, she attended just three hearings between December 2018 through January 2022. Her own counsel informed the trial court he had limited, infrequent contact with Sharee W. See *B.C.*, 317 Ill. App. 3d at 613 (stating "respondent has a duty to follow the progress of her case and to learn from her attorney the date of the termination hearing" (citing *In re C.L.T.*, 302 Ill. App. 770, 778, 706 N.E.2d 123, 129 (1999))). Moreover, like *B.C.*, this case had been slogging through the system with many delays and even more opportunities for Sharee W. to appear and participate, but she did neither and the court determined the case must move along because K.S. needed permanence. See *B.C.*, 317 Ill. App. 3d at 613-14 (noting the trial court's default judgment "was simply trying to 'move [the] case along' "). Considering the particular circumstances here, we conclude Sharee W.'s repeated failures to appear amounted to " 'deliberate, contumacious, or unwarranted disregard for the court's authority' " (*B.C.*, 317 Ill. App. 3d at 612 (quoting *D.R.*, 307 Ill. App. 3d at 482)) that warranted sanctions. Consequently, we cannot say the trial court abused its discretion in entering a default judgment against Sharee W. when she did not appear at the fitness hearing—meaning its decision was not arbitrary nor unreasonable. See *D.R.*, 307 Ill. App. 3d at 482. And since we find no threshold error, we need not belabor a plain-error analysis on the default judgment. See *Walker*, 232 Ill. 2d at 124.

¶ 47                            2. *Trial Court's Fitness Findings*

¶ 48            Building upon her argument that the trial court erroneously entered a default judgment against her in the fitness hearing, Sharee W. next argues the trial court's fitness findings stand against the manifest weight of the evidence because the State failed to produce

evidence proving her unfitness. We disagree.

¶ 49 Sharee W.'s argument seems to hinge on her presupposition that the State still must prove its unfitness allegations against her, even though trial court already defaulted her. Though Sharee W. cites no authority on point, our own review reveals the law appears unsettled on this question—must the State still prove-up its unfitness allegations when the trial court enters a default judgment on fitness? Unless the Juvenile Court Act provides a different governing procedure, "[t]ermination proceedings under the Act employ the general rules of civil practice and the provisions of the Code of Civil Procedure." *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 54, 168 N.E.3d 210. The Juvenile Court Act allows for default judgments "against any parent who has been properly served in any manner and fails to appear." 705 ILCS 405/2-21(1) (West 2020). Since the Juvenile Court Act does not otherwise provide governing instructions on default judgments in termination proceedings, we look to the Code of Civil Procedure for instruction on whether the State must still prove its factual allegations. Section 2-1301(d) of the Code of Civil Procedure provides: "Judgment by default *may* be entered for want of an appearance, or for failure to plead, but the court *may* in either case, require proof of the allegations of the pleadings upon which relief is sought." (Emphases added.) 735 ILCS 5/2-1301(d) (West 2020). Under the Code of Civil Procedure, trial courts have discretion to enter default judgments for failure to appear, but it also gives them discretion to require the moving party to prove-up its allegations in addition to the default.

¶ 50 We acknowledge there are instances where the trial court entered a default judgment against a parent in a termination proceeding and still required the State to prove the allegations in the petition. See *B.C.*, 317 Ill. App. 3d at 609, 614; *C.L.T.*, 302 Ill. App. 3d at 776. We certainly think it is best practice to still require the State to meet its burden and prove the

- 21 -

petition's allegations. But since section 2-1301(d) uses discretionary language, we cannot conclude the State must prove-up its fitness allegations when the trial court had already entered a default judgment on that issue.

¶ 51 The State's petition to terminate Sharee W.'s parental rights alleged she was unfit on three grounds: (1) her failure to make reasonable efforts during the period of January 13, 2020, to October 13, 2020, to correct the conditions leading to K.S.'s removal from the home (750 ILCS 50/1(D)(m)(i) (West 2020)); (2) her failure to make reasonable progress during the period of January 13, 2020, to October 13, 2020, toward the return of K.S. to her care (750 ILCS 50/1(D)(m)(ii) (West 2020)); and (3) her failure to maintain a reasonable degree of interest, concern, or responsibility for K.S.'s welfare (750 ILCS 50/1(D)(b) (West 2020)). By failing to appear and receiving a default judgment as to fitness, Sharee W. admitted these allegations. See *Pekin Insurance Co. v. Campbell*, 2015 IL App (4th) 140955, ¶ 38, 44 N.E.3d 1103 ("A default admits the facts alleged against a defendant in the complaint to be true."). The State, therefore, did not need to present evidence showing Sharee W. unfit since the trial court did not require proof of the allegations, having noted several times her continuous and repeated failures to appear or be involved in the proceedings. Her absence admitted her unfitness. See *Universal Casualty Co. v. Lopez*, 376 Ill. App. 3d 459, 465, 876 N.E.2d 273, 279 (2007) ("In general, a default is regarded as an admission of the material facts stated in the complaint.").

¶ 52 Though we affirm the trial court's judgment, we pause to note several troubling issues we see in this case. Parental rights are among the most fundamental rights recognized in our society. *In re M.C.*, 2018 IL App (4th) 180144, ¶ 29, 110 N.E.3d 346. Given the significant rights at stake, we think it best practice to require the State to prove the allegations in the termination petition, particularly since Sharee W.'s attorney had previously denied the petition's

allegations on her behalf. "Illinois public policy prefers to decide legal issues on their merits" and considers default judgments "drastic measure[s]" and "last resort[s]." *Dupree v. Hardy*, 2011 IL App (4th) 100351, ¶¶ 57, 59, 960 N.E.2d 1. Here, this case could have easily been decided on its merits, especially since the caseworker (Wilder) was present and presumably prepared to testify as to Sharee W.'s unfitness as she did for the other parents. Rather than hear the evidence, the trial court simply entered a default judgment. We also find the trial court's order confusing because it contained three unfitness findings but also contained a handwritten notation that Sharee W. had been defaulted. The order then noted Sharee W. had been found unfit. It seems odd to include unfitness findings when no evidence was presented. It is probable the trial court used a prepared order and simply failed to mark out the unfitness findings, but as it sits in the record, the order is puzzling. What is more troubling, however, is the trial court's decision to allow Sharee W.'s attorney to withdraw and leave the courtroom before the testimony commenced. By defaulting Sharee W. and then allowing her attorney to leave the fitness hearing, she was left without any representation whatsoever concerning her fundamental liberty interest in parenting her child, which raises a legitimate concern of a due process violation. See *In re M.B.*, 2019 IL App (2d) 181008, ¶ 14, 129 N.E.3d 631 (holding defaulted father's "due process rights were violated when the trial court dismissed his appointed counsel before the unfitness hearing"). Though we find these issues troubling, we recognize Sharee W. acquiesced in any errors that may have occurred in the fitness hearing by appearing at the best-interests hearing and yet failing to challenge the default, the unfitness findings, or the dismissal of her counsel. See *In re Z.P.*, 2021 IL App (4th) 200496-U, ¶ 26 (quoting *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 60, 129 N.E.3d 755).

¶ 53                                  B. Best-Interests Determination

¶ 54 Once a trial court finds a parent an "unfit person," it must next consider whether terminating that person's parental rights serves the child's best interest. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80, 966 N.E.2d 1107 (stating, once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). The State bears the burdens of proof and persuasion and must prove terminating parental rights serves a child's best interest by a preponderance of the evidence. *D.T.*, 212 Ill. 2d at 365-66. When considering whether termination is in a child's best interest, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2020). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *Daphnie E.*, 368 Ill. App. 3d at 1072.

See also 705 ILCS 405/1-3(4.05) (West 2020).

¶ 55            A trial court's finding that termination of parental rights is in a child's best

interest will not be reversed on appeal unless it is against the manifest weight of the evidence.

*In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. The court's decision will be

found to be "against the manifest weight of the evidence only if the opposite conclusion is

clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re

Keyon R.*, 2017 IL App (2d) 160657, ¶ 16, 73 N.E.3d 616.

¶ 56            Sharee W. contends the trial court "failed to consider properly the best interests of

K.S. as required." Yet she provides no allegations or examples showing impropriety in the trial

court's analysis. From our view, the record shows Sharee W.'s argument is unsupported. The

trial court properly noted the focus during the best-interest stage centers upon the child, not the

parent or reunification. Likewise, it properly considered the best-interest factor relating to the

child's need for permanency. The evidence supports the court's best-interest determination

generally and its conclusion concerning the permanency factor specifically.

¶ 57            To be sure, the State presented ample evidence showing that terminating Sharee

W.'s parental rights served K.S.'s best interest. Through testimony from the DCFS caseworker,

Wilder, and the written best-interest report from DCFS, the State showed K.S. was doing well

while living in his grandmother's home. For example, the best-interest report outlined how the

grandparents met "[K.S.]'s needs for food, clothing, shelter, and safety." They likewise

advocated for K.S.'s "educational needs" and helped him with his schoolwork. The report

documented that K.S. did well in school with an IEP in place. Wilder testified K.S. had bonded

well to his grandparents. He was happy and thriving in his grandparents' home. Wilder noted

K.S. bonded with his biological brother, who also lived in the grandparents' home. Wilder

opined K.S. was doing well in his current placement. Indeed, the record shows K.S. is loved,

valued, secure, and nurtured in his current placement. He enjoys structure in his grandparents' home. All told, this record evidence supports the trial court's decision that terminating Sharee W.'s rights served K.S.'s best interest, meaning the decision is neither unreasonable nor arbitrary. See *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 58        Since the evidence does not lead us clearly to the opposite conclusion, we cannot say the trial court's best-interest determination goes against the manifest weight of the evidence. *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 59                                 III. CONCLUSION

¶ 60        For the reasons stated, we affirm the trial court's judgment.

¶ 61        Affirmed.