NOTICE
Decision filed 08/22/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230668-U

NO. 5-23-0668

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* DALTON J., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Massac County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-JA-18 |
| | ) | |
| Dallen J., | ) | Honorable |
| | ) | Cord Z. Wittig, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: Termination of respondent's parental rights is affirmed where consideration of the *Mathews* factors fails to reveal that respondent's due process rights were violated when the trial court denied respondent's requested continuance due to his incarceration in another state.

¶ 2    Respondent, Dallen J., appeals the trial court's September 1, 2023, order terminating his parental rights. On appeal, he argues that the trial court's denial of his motion to continue the fitness hearing violated his right to due process. For the following reasons, we disagree.

1

¶ 3                                    I. BACKGROUND

¶ 4     Dallen and Evlinda[1] are the biological parents of Dalton, born April 13, 2012. On April 7, 2020, Dalton was removed from their custody. At the shelter care hearing, Stacy Hefner, a child protection specialist with the Illinois Department of Children and Family Services (DCFS), testified that DCFS received a hotline report alleging that a child was living in a camper where methamphetamine was being manufactured. Ms. Hefner called police officers to accompany her and investigate the situation at Dallen and Evlinda's camper in Brookport, Illinois, on April 7, 2020. Ms. Hefner stated that the inside of the camper smelled, and no utility service was seen. She stated that Evlinda denied entry into the camper to either confirm or deny the existence of the endangering environmental concerns, and when Dalton came out of the camper, he was very dirty. She stated that during her conversation with Evlinda, her speech was slurred, and her movements were impaired to such extent that Ms. Hefner believed Evlinda was intoxicated. Ms. Hefner testified that Dalton was never enrolled in school and Dallen had a history of substance abuse, domestic abuse, and an outstanding warrant in Massac County. Counsel was appointed for Dallen and Evlinda. Dallen and Evlinda advised the court that they had been trying to move for the past nine months but their lack of a vehicle, due to a prior accident, precluded their departure from Illinois. The trial court found probable cause and ordered twice a week visitation with the child.

¶ 5     On June 10, 2020, Caritas Family Solutions (Caritas), a subcontractor for DCFS, filed a status report with the court. The report stated that both parents completed their integrated assessments. Dallen was recommended services for substance abuse, domestic violence as a perpetrator, and mental health. He was also required to ensure utilities were in the residence, attend

_____

[1]Evlinda is not a party to this appeal. Information related to her included in this decision is provided solely for context related to Dallen's appeal.

visitation, and participate in drug testing. The report indicated that the agency heard that Dallen threatened to burn someone's house down after Dalton was taken into care and threatened to take Dalton from care. Dallen attended two of the six scheduled drug tests. The parents attended visitation virtually. However, during the May 29, 2020, visitation, staff believed Evalinda was under the influence due to her erratic actions that included rolling her eyes back in her head, an inability to keep her head up, popping her jaw back and forth, and sucking on Dallen's chest.

¶ 6    The Caritas report also revealed that Dalton had few social skills, talked down to women, hated to be outside, did not like being told "no," and only wanted to watch television and play video games. He had no fear of strangers and used the "n word" and other foul language in the home. His assessment revealed he was a witness to Dallen's domestic violence toward Evlinda, including choking and pulling a knife on her. Dallen would also spank Dalton with a belt that made him bleed when the buckle hit his skin. Dalton stated that the shower did not work in the camper and therefore he used a washcloth to bathe. He had not recently seen a doctor, received no vaccines after age four, and had vision problems that were over five years old that were fixed with glasses after Dalton entered DCFS's care.

¶ 7    On June 10, 2020, DCFS filed a status report. The report contained similar information to the Caritas report and added that Dalton was referred to counseling to develop coping skills and deal with trauma. He was also referred for dental care and was enrolled in school.

¶ 8    The adjudicatory hearing was held on July 22, 2020. Testimony was provided by Ms. Hefner, Summer Clapp, who was a police officer that accompanied Ms. Hefner to the parents' camper on April 7, 2020, and Kelsie Arp, a caseworker from Caritas. Their testimony addressed how Dalton came into care and information received thereafter. Evlinda testified about her medical condition and the camper's utilities. Following the hearing, the trial court found the State proved

3

Dalton was neglected. The trial court's written adjudicatory order found that Dalton was neglected because he suffered from a lack of support, education, and remedial care pursuant to section 2-3(1)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a) (West 2020)) and was in an environment injurious to his health pursuant to section 2-3(1)(b) of the Juvenile Court Act (*id.* § 2-3(1)(b)).

¶ 9 On August 11, 2020, Caritas filed a dispositional report. That report indicated that Dallen was not interested in participating in services. The parents had only missed one visit; however, during most visits, they talked to the case aides more than Dalton. The report recommended completion of the service plans and provided a goal of returning home in 12 months.

¶ 10 The dispositional hearing was held on September 23, 2020. The parties agreed to the agency recommendations related to services and requested two hours with Dalton once a week instead of two one-hour sessions twice a week. The request was granted. A written dispositional order was filed on October 1, 2020, that found Dallen was unwilling to participate in services because he did not believe they were necessary.

¶ 11 The November 17, 2020, Caritas report noted that Dalton was eight years old and was doing well in school. He read at an eighth-grade level, was making friends, developing social skills, and growing more rounded in his education. He loved school and was happy. He was also in counseling. The report further noted that Dallen participated in 4 of 17 drug tests. He was positive for methamphetamine on three of the tests and had not engaged in domestic violence services. The report revealed that when Dallen and Evlinda were assessed for drug and mental health services, both denied taking drugs or having mental health issues and therefore no services were recommended. The agency requested reassessment with correct information being provided.

¶ 12    DCFS filed a permanency hearing report on December 8, 2020. The report revealed that while Evlinda and Dallen regularly attended visits with Dalton, both parents blamed Dalton for his removal and claimed that he lied to the caseworkers. The agency found the parents' blaming Dalton for his removal at visitation made it difficult for Dalton to communicate openly in counseling. He would also become distant in the foster home after the visits. He continued to do well in school and his behavior in the foster home was much better. The report stated that when Dallen was confronted about the drug testing that was positive for methamphetamine, he claimed his neighbors injected his water with the drug. He was not engaged in any services. A permanency hearing on December 16, 2020, revealed the parents were heating their camper with a toaster oven and hair dryers. The permanency goal remained the same.

¶ 13    On January 14, 2021, DCFS suspended the parental visits. The correspondence directed to the parents stated the suspension was in the best interest of Dalton and was due to their failure to adhere to the visitation guidelines. Dalton was exhibiting increased verbal and physical aggression in the foster home following the visits and Dalton's counselor recommended suspension of the visits. A copy of the counselor's correspondence was attached to the suspension.

¶ 14    A permanency report was filed by Caritas on March 10, 2021. The parents were not reporting for drug testing and had moved to Paducah, Kentucky, after their camper was impounded on March 5, 2021. Evlinda claimed that Dallen stole her Social Security money and left her. She further stated that Dallen was hallucinating that "people were hiding under the hotel bed and saying things to him." Dallen had not participated in any services or drug testing. Counseling was helping Dalton. He missed his parents but was mostly worried about his mother's well-being.

¶ 15    On April 16, 2021, the guardian *ad litem* (GAL) filed a petition to permanently suspend visitation. In support, the petition listed statements made by Evlinda during visitation that included

her need to "eat her scabs because she is a vampire" and Dalton's difficulties with visitation. On April 21, 2021, Evlinda's lawyer filed an objection to the petition claiming the petition was based on the same letter from January 2021, and the counselor may no longer feel that way. The objection further claimed that it was not uncommon for a child to experience a divided loyalty between his parents and his foster parents.

¶ 16    On May 15, 2021, Caritas filed a permanency report. The agency provided three virtual visits. Evalinda only attended one. After she missed the last two visits, Dalton stated that he no longer wanted visits with either parent. Dallen was not participating in any services. Dalton was now nine years old and participating in baseball. He was doing terrific in school and was interacting with some of the neighbor children. His foster parents said Dalton was uncooperative during the three weeks that visitation was reinstated. That behavior decreased when the visits stopped.

¶ 17    At the permanency hearing on May 26, 2021, the court was advised that the case passed legal screening as to both parents on May 21, 2021. The court considered a goal change but, after hearing arguments, did not change the goal and left visitation at the discretion of the agency. The court's June 9, 2021, permanency order found Dallen made neither reasonable effort nor reasonable progress.

¶ 18    On September 16, 2021, a permanency report was filed by Caritas. The report revealed that Evlinda stated she was leaving Dallen and requesting full custody of Dalton. A meeting with the caseworker was scheduled in July but Evlinda did not show up for the meeting. Dallen said he was divorcing Evlinda. Two virtual visits took place. Dalton said he did not want to attend any more visits. The parents did not have stable housing and stated they were involved with the flood incident in Tennessee in August 2021 and were waiting for help from the Federal Emergency

6

Management Agency (FEMA); however, they had not provided the necessary information to FEMA as of September 14, 2021. Dallen was not engaged in any services. Dalton was excelling in school, got his hair cut, no longer wanted anything to do with his parents, and wanted his foster parents to adopt him. The agency recommended a change in the permanency goal to substitute care pending determination of termination of parental rights. Updated correspondence from Dalton's counselor revealed Dalton's behavior improved without parental visits and his nightmares and outbursts lessened when the visits were suspended. Based on the counselor's letter, the agency again suspended visitation.

¶ 19    On December 15, 2021, the parents requested an *in camera* interview with Dalton due to correspondence from Dalton's counselor recommending cessation of visitation. The motion stated that Dalton was old enough to speak his wishes to the court and he should be required to do so.

¶ 20    On December 17, 2021, the trial court interviewed Dalton. Dalton no longer wanted to visit his parents and stated he was glad his parents no longer lived in Illinois. He talked about their drug and alcohol use, as well as their physical abuse against each other, his grandparents, and him. A hearing was held on both the recommendation to change the permanency goal and discontinue visitation. Following the hearing, the court changed the permanency goal to substitute care pending determination of termination of parental rights and discontinued visitation. The January 10, 2022, permanency order found that neither Evlinda, nor Dallen, made reasonable effort or reasonable progress.

¶ 21    On May 25, 2022, a permanency hearing report was filed. The report indicated that Dallen completed parenting classes and was now engaged in online domestic violence services. However, the report noted that Dallen and Evlinda fought before and after the parenting classes. The parents remained a couple and were looking for housing. Dalton was excelling at school, made friends,

7

and adamantly refused to attend visits with his parents. He stated that he wanted to stay with his foster family forever and if he was returned to his parents, he would run away. He also participated in sports. The recommended goal change was for adoption.

¶ 22 On May 27, 2022, the State filed a petition to terminate parental rights. With regard to Dallen, the State alleged he was unfit for (1) failing to maintain a reasonable degree of interest, concern, or responsibility for the child's welfare pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2022)); (2) failing to protect the child from conditions within his environment injurious to the child's welfare pursuant to section 1(D)(g) of the Adoption Act (*id.* § 1(D)(g)); and (3) failing to make reasonable efforts to correct the conditions that were the basis of the child's removal for any nine-month period following the adjudication of a neglected or abused child pursuant to section 1(D)(m)(i) of the Adoption Act (*id.* § 1(D)(m)(i)). At the hearing on May 27, 2022, the petition was read to the parents along with their rights under the Act. Both parents stated they understood what the State was alleging and their rights under the Act. The fitness hearing was scheduled for August 26, 2022.

¶ 23 On August 24, 2022, a permanency report was filed. Dallen was scheduled for a psychological evaluation on August 17, 2022, but the agency did not have any information regarding the appointment or whether he was participating in mental health services. His drug testing revealed a faint trace of THC on March 25, 2022, tampered urine on April 29, 2022, and failures to appear for testing on July 28 and August 17, 2022. The agency could not verify Dallen's participation in online domestic violence classes. Dallen remained without housing.

¶ 24 Dalton was now 10 years old and in a potential adoptive placement. He continued to refuse to attend visits. He had a positive relationship with the foster parents and his foster siblings. He and the foster family repeatedly stated that he wanted them to adopt him, and they wanted to adopt

8

him. He continued to excel in school, had friends, and was involved in sports. He was in counseling that was proving beneficial and continued to make progress. The report noted that the case had been open over two years and very little progress was made by the biological parents. The recommended goal was adoption once parental rights were terminated.

¶ 25    On August 24, 2022, Dallen's attorney moved for a continuance of the August 26, 2022, hearing. On August 26, 2022, the trial court granted the motion, and the fitness hearing was rescheduled for October 28, 2022. On October 28, 2022, the State filed a notice clarifying that its petition to terminate parental rights was based on the periods from July 23, 2020, through December 17, 2021, and December 18, 2021, through October 28, 2022. The dates were the same for both parents. The fitness hearing proceeded over the objection of Dallen's attorney as to the late information regarding the nine-month periods.

¶ 26    The State called Constance Hernandez, a foster care supervisor for Caritas, to testify. She became involved in Dalton's case approximately three months after he was removed from the camper. She was the supervisor on the case for about a year before the hearing. She stated that the parents' recommended services included: mental health assessments and treatment, substance abuse assessments and treatment, drug screens, parenting classes, domestic violence counseling, and finding and sustaining stable housing. They were also required to cooperate with the agency. She explained that two mental health assessments were required for each parent due to their failures to provide accurate information during the initial assessments. Dallen was recommended for mental health counseling but made no attempt to complete his mental health counseling from April 2020 to August 2022. To her knowledge, Dallen was not receiving mental health counseling at the time of the hearing. Both parents completed the substance abuse assessment but were not forthcoming with the assessor based on the drug testing results that were received. The tests taken

9

June 24, 2020, August 19, 2020, September 21, 2020, and November 16, 2020, were positive for methamphetamines for both parents. Based on those results, the agency recommended substance abuse treatment. Neither parent completed that treatment. The parents participated in a drug screen in March 2022 but were inconsistent in returning from Tennessee to take additional tests. Dallen's urine was either insufficient for testing or tampered with. Thereafter, Dallen objected on the basis of hearsay to Ms. Hernandez's testimony related to Dallen's drug testing, the parents' failure to appear for drug testing, and eventually, all the information in the Caritas permanency report. The court found the reports were inadmissible hearsay but stated it would allow the State to obtain an affidavit to satisfy the modified business record exception to the hearsay rule. Thereafter, the court continued the hearing until January 27, 2023. On January 25, 2023, the State moved for a continuance due to the unavailability of some of its witnesses. The motion was granted, and the fitness hearing was rescheduled for May 16, 2023.

¶ 27    On April 27, 2023, Caritas filed an updated report and service plan. The report noted that the parents were now living in Tennessee and would not sign consents that would allow the agency to verify service participation. Dalton was 10 years old and was discharged successfully from counseling. No medical services beyond immunizations were necessary. He loved school, was making social connections, was a straight A student and read at a ninth-grade reading level. He was also participating in summer baseball, Boy Scouts, and band. He no longer called his biological parents "mom and dad" but used their first names. He had a strong bond with his foster parents and foster siblings. The report found Dallen unsatisfactory for all services recommended in the plan.

¶ 28    The fitness hearing resumed on May 16, 2023. Neither Evlinda, nor Dallen, were present; however, Evlinda's attorney stated Evlinda was outside in her car with her dog and cat and that

10

she said Dallen was in jail. Dallen's attorney orally moved for a continuance, stating that Dallen was allegedly charged with some type of battery against Evlinda, but Evlinda told his secretary the incident did not happen, and she was injured accidentally. The attorney tried unsuccessfully to contact Dallen at the jail. He stated there was also a hold for a similar charge in a different county and stressed that Dallen was presumed innocent of all the charges. He stated that he planned to call the only witness to "say that he's not guilty" and "didn't do those things." Evlinda's attorney joined in the requested continuance and stated that her client was "working on dismissing the charges." The State objected to the requested continuance, noting the petition for termination was filed nearly a year earlier, the case had been open for three years, and argued that Dalton deserved permanency. It further argued that Dallen was in jail and his current incarceration was the result of his own actions which should not affect Dalton's future and requested a finding of default against Dallen. Dallen's attorney disputed that Dallen's actions were the cause of his incarceration and stated he just received the contact information for the jail from Evlinda's attorney and would call the jail before 1 p.m. Evlinda's attorney again stated that she wanted Dallen to be at the proceeding and reminded the court of the State's requested continuance at the initial hearing that was granted. She further stated that Dallen was in the Montgomery County, Tennessee, jail and had court at 1:30 p.m. A brief recess was taken to allow Dallen's attorney to contact Dallen or the jail to obtain details regarding the charges.

¶ 29    After the recess, Dallen's attorney confirmed that Dallen was in jail in Tennessee and had a 1:30 p.m. hearing. His bond was set at $7500. Dallen was charged with domestic assault and unlawful drug paraphernalia in Montgomery County, Tennessee, and aggravated assault in Humphreys County, Tennessee. Dallen's attorney argued that Dallen was presumed innocent of those charges. The court asked how long Dallen had been in jail and Evlinda's attorney responded,

11

"Two weeks." The court asked if Dallen's attorney had any evidence to submit and Dallen's attorney called Evlinda in support of his motion to continue.

¶ 30 Evlinda confirmed that Dallen was in jail and that she was working to get the charges that involved her dismissed. When asked if she was requesting the dismissal because the charges were unfounded, she stated it was "more to put it into God's hands than the Court's hands." She clarified that the drug paraphernalia charge was from a year earlier. On cross-examination, Evlinda clarified that she was the victim involved in both the domestic assault and aggravated assault charges. The aggravated assault incident occurred two or three weeks before the domestic assault incident. When Dallen was arrested for the Humphreys County case, he had an outstanding warrant. She stated that both arrests occurred in the last month and confirmed that both incidents occurred. She agreed the aggravated assault charge was a felony but did not know if the domestic assault was a misdemeanor or a felony. She stated that Dallen was never at the Humphreys County jail and had not appeared in the Humphreys County courthouse. He was in Montgomery County.

¶ 31 The parties provided argument and Dallen's attorney offered to arrange for Dallen to appear virtually. The court stated that he would need to arrange the appearance in the next hour and 15 minutes. Dallen's attorney stated that Dallen would be in court at 1:30 p.m. Thereafter, the court stated,

> "[Evlinda] testified under oath that *** the incidents occurred; she was the victim. She
> didn't say it didn't occur. She affirmed it occurred, whatever they are. But whatever they
> are is why he's in jail, that's why he's not here today. So[,] the Motion to Continue will be
> denied."

Thereafter, the court again stated it would allow Dallen to appear virtually for the fitness hearing, if possible. The court then recessed until 1 p.m. to allow Dallen's attorney to try to contact Dallen.

The attorney again noted that Dallen had a court appearance at 1:30 p.m. but stated he would see if he could arrange for Dallen's participation.

¶ 32    The parties returned at 1 p.m., Dallen was not present virtually, and the State again requested a default judgment against Dallen. The court granted the default judgment over Dallen's attorney's objection. Dallen's attorney then advised the court that he wished to leave the proceeding since his client was found unfit by default. The court stated Dallen's counsel could stay if he wanted but counsel declined. Following the hearing, the court found Evlinda was unfit on all the bases alleged by the State and set the best interest hearing on June 30, 2023.

¶ 33    On June 28, 2023, Dallen's attorney filed a motion for reconsideration of the default judgment and further moved for a continuance of the best interest hearing. The request for reconsideration argued that Dallen was not present for the hearing because he was incarcerated; however, his criminal charges were dismissed and Dallen was presumed innocent. Dallen's motion further argued that his due process rights were violated because his attorney was dismissed from the fitness hearing after the default judgment was issued, he had no representation at the hearing, and he was entitled to have counsel at the hearing. He argued that these events violated his due process rights because he did not voluntarily choose not to participate in the hearing. On June 29, 2023, the trial court granted Dallen's motion to continue, and the best interest hearing was rescheduled for August 25, 2023.

¶ 34    On August 17, 2023, Caritas filed a status report. The report revealed that Dallen was recently incarcerated in Massac County, Illinois, for a "revoked/suspended license" charge on July 29, 2023. He was no longer incarcerated as of the date of the report, and the agency was unaware of his current location because Dallen had not contacted the agency. Dalton was now 11 years old and continued to do well with his foster family and school. The report stated that Dalton blossomed

13

during foster care and was now outgoing, witty, and adventurous. He was in sixth grade and read at a ninth-grade level. He enjoyed living with the foster family and repeatedly told caseworkers that he would like to be adopted by the foster family. He has also indicated that he had no desire to be in contact with either of his biological parents. Dalton had been in foster care for 1233 days.

¶ 35 The best interest hearing was held on August 25, 2023. The court first addressed Dallen's motion for reconsideration. Dallen's attorney argued that Dallen was innocent of the charges as they had been dismissed and it was unfair for him not to be present at the hearing. The court recalled the discussion from the best interest hearing as well as Evlinda's testimony about dismissing the charges. Thereafter, the trial court denied Dallen's motion and moved to the best interest hearing.

¶ 36 The GAL provided an oral report based on his conversation with Dalton that morning at his school. The GAL stated everything remained the same as when the court spoke with Dalton. Dalton's feelings had not changed regarding his parents, and he did not wish to have any contact with either parent, even when asked separately about each parent. He stated that he loved his foster family, their home was his home, and this was his school. He was currently in the sixth grade and doing great. He enjoyed his current homeroom teacher, and his favorite subject was science. Dalton stated that he wanted his current foster family to adopt him.

¶ 37 The GAL also spoke with Dalton's foster mother who stated that she and the maternal grandparents had a great working relationship, and the grandparents spent every other week with Dalton that summer. Dalton spent holidays and long weekends with them as well as every other weekend, which she believed was in his best interests. She further stated that if they were allowed to adopt Dalton, they would continue to foster that relationship, noting that the grandparents had a

14

restraining order against Dallen. She stated that the grandparents were also in favor of the foster family adopting Dalton.

¶ 38    The State called Marcus Clarry, the lead foster care manager at Caritas, who testified that Dallen had not contacted the agency since the fitness hearing and neither he, nor anyone in his office, had any contact with Dallen during that time. Mr. Clarry met with Dalton three times since the fitness hearing. Dalton was doing very well and was very intelligent. He was involved in his school activities. He loved science, math, and reading. He was very advanced with reading. He was also in the Boy Scouts. He tried baseball over the summer but did not enjoy it and preferred being hands-on in the wilderness with the Boy Scouts. He considered the foster family his family. Dalton also had several friends at school.

¶ 39    Mr. Clarry stated that the foster family provided shelter, clothing, and food for Dalton. They also maintained his doctors' appointments. Dalton had been with the foster family since July 2021, which was over two years. He was secure with the foster family, and they showed him great affection. He believed it was in Dalton's best interest for the foster family to adopt him.

¶ 40    On cross-examination, Mr. Clarry stated that he tried to contact Dallen after the fitness hearing. He even called the Massac County jail, but Dallen had already been released. Mr. Clarry did not request contact information from the jail because he knew from experience that it would not be provided. He did not try to contact the Massac County State's Attorney to request Dallen's contact information. He stated that the parents had the agency's phone number if they wanted to contact him. He stated that he saw Dalton's bedroom and it contained a bed, clothes, and all his necessities. He stated the foster family was ready to adopt Dalton as soon as it was able. Thereafter, the State rested.

¶ 41　Evlinda testified about her attempts to contact Caritas to request a picture of Dalton and provide a gift card for him from her inheritance. Dallen testified that he was with Evlinda during three of her attempts to contact the agency. Following the testimony and argument, the court found that Dalton's best interests were served by terminating both Evlinda and Dallen's parental rights. Dallen timely appealed.

¶ 42　　　　　　　　　　　　　　　II. ANALYSIS

¶ 43　We must first address the delay in the issuance of this order. This case is subject to an expedited disposition pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018). Rule 311(a)(5) requires the appellate court to issue its decision 150 days after the notice of appeal is filed, except when good cause is shown. Here, the notice of appeal was filed on September 8, 2023, making our decision due by February 5, 2024. Although this court makes every effort to comply with the Rule 311(a)(5) deadline, respondent's initial appointed appellate counsel failed to file any brief despite this court's orders to do so. Due to the lack of compliance with this court's orders, alternative appellate counsel was eventually appointed and, upon request, was granted additional time to file respondent's brief. Accordingly, we find that good cause exists for filing this decision beyond the deadline.

¶ 44　Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). After a petition for involuntary termination is filed under the Juvenile Court Act, a two-step process is required for parental rights termination. See 705 ILCS 405/2-29(2) (West 2022). "The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018))." *In re J.C.*, 2020 IL App (2d) 200063, ¶ 27. After a trial court finds the

16

parent unfit, the cause proceeds to the second step and the trial court determines whether it is in the best interest of the child to terminate parental rights. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1071 (2006).

¶ 45 On appeal, Dallen does not provide any argument regarding the trial court's finding that it was in Dalton's best interest to terminate Dallen's parental rights. Instead, Dallen argues that the trial court deprived him of his due process rights by denying his motion to continue the fitness hearing while he was incarcerated in Tennessee. The State first argues that this is not a due process issue, and our only concern is whether the trial court abused its discretion in denying the requested continuance. In the alternative, the State argues that even if due process is at issue, review of the *Mathews* factors (see *Mathews v. Eldridge*, 424 U.S. 319 (1976)) fails to reveal a due process violation.

¶ 46 We find the State's initial argument claiming due process is not at issue, unpersuasive. While a court may grant a default judgment in termination proceedings (see *In re K.S.*, 2022 IL App (4th) 220350-U, ¶ 39), in certain circumstances, the basis of the court's determination may raise issues of due process. Due process includes heightened protection against governmental interference with a parent's fundamental rights in making decisions concerning the care, custody, and control of their children. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Accordingly, we apply the test developed in *Mathews*, 424 U.S. 319, to determine whether respondent received procedural due process in these proceedings. See *In re D.T.*, 212 Ill. 2d 347, 362 (2004); *In re Andrea F.*, 208 Ill. 2d 148, 165 (2003); *In re M.H.*, 196 Ill. 2d 356, 364-65 (2001).

¶ 47 As stated by the Illinois Supreme Court,

"Under *Mathews*, the dictates of due process require consideration of three factors: '[f]irst, the private interest that will be affected by the official action; second, the risk of an

17

erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " *In re D.T.*, 212 Ill. 2d at 362-63 (quoting *Mathews*, 424 U.S. at 335).

¶ 48 Regarding the first factor, Dallen argues that the private interest at stake is maintaining his familial relationship with his son. We do not disagree. "At the unfitness stage, the interests of the parent and the child coincide to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship.' " *Id.* at 363 (quoting *Santosky*, 455 U.S. at 760-61). Accordingly, we find this factor weighs in favor of Dallen.

¶ 49 The second *Mathews* factor requires this court to consider the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards. Here, Dallen argues that the trial court's refusal to grant the continuance due to his incarceration resulted in an erroneous deprivation of his private interest. He argues that the trial court's action deprived him of the opportunity to be heard at a meaningful time in a meaningful manner because he never requested any prior continuance, and no alternative procedure was provided by the court. He also argues that although the court stated it would allow Dallen to participate virtually at the 1 p.m. hearing, the offer to participate was not provided prior to the default hearing. He further argues, citing *In re A.C.*, 354 Ill. App. 3d 799 (2005), that no effort was made to allow him to participate despite accessible technology that would have allowed him to participate and therefore this factor weighs in his favor. We disagree.

¶ 50 First, while Dallen contends that he never asked for any other continuance, the record reveals that he requested, and received, a continuance of the originally scheduled fitness hearing

18

on August 26, 2022. It was Dallen's request for continuance that caused the fitness hearing to be rescheduled for October 28, 2022.

¶ 51 Second, Dallen's contention that the court made no offer that would allow him to participate virtually until after the default hearing was granted, is also contradicted by the record. The case was called three times on May 16, 2023. The first time neither parent was in the courtroom and only scanty details regarding Dallen's incarceration were provided to the court. The court then granted a brief recess to allow Dallen's counsel to call the correct courthouse to obtain additional information regarding Dallen's situation.

¶ 52 When the case was called the second time, Dallen's counsel advised the court that Dallen was incarcerated in Tennessee due to pending charges for domestic assault and unlawful drug paraphernalia in Montgomery County and an aggravated assault charge in Humphreys County. The court was advised that Dallen had been in jail for the past two weeks. Thereafter, Dallen's attorney called Evlinda to testify in support of his motion to continue.

¶ 53 Evlinda's testimony confirmed a pending domestic assault charge in Montgomery County and a pending aggravated assault charge in Humphreys County. She further confirmed that while she was trying to assist Dallen by requesting the charges be dismissed, the abusive incidents did occur, and she was the victim of both assaults. She stated the incidents occurred within two or three weeks of each other and that Dalton had been in jail for two weeks at the time of the fitness hearing. During arguments following Evlinda's testimony, Dallen's attorney offered to arrange for Dallen to appear virtually. The court was receptive and stated that counsel would need to arrange the appearance in the next hour and 15 minutes. Following argument, the court denied the motion to continue but again provided an opportunity for Dallen to appear virtually by taking a break until

19

1 p.m. and stating that if Dallen could find a way to virtually attend the hearing, the court would allow him to appear for the hearing.

¶ 54 As to the second *Mathews* factors, it is clear the trial court invited risk of the erroneous deprivation of Dallen's parental interests when it denied the motion to continue. However, contrary to Dallen's argument on appeal, the court twice offered an alternative method that would allow Dallen's virtual appearance prior to the third hearing in which the State moved to default Dallen. Given the opportunities afforded to Dallen to accommodate his incarceration in another state, we cannot find the procedural safeguards afforded to Dallen in the lower court proceedings were insufficient to protect his rights as he was afforded the opportunity to participate virtually in the hearing, despite his incarceration in another state. We further note that Dallen was in jail for two weeks prior to the hearing. At no time prior to the date of the hearing is there any record that Dallen, or his counsel, apprised the court or the agency of his incarceration, file a written motion to continue the case at bar in advance of the fitness hearing, or request a continuance in his criminal case, despite knowing that the hearings were on the same date.

¶ 55 Nor do we find Dallen's reliance on *In re A.C.* to have merit. In *A.C.*, the respondent participated in the fitness hearing by telephone due to his incarceration in another state and argued on appeal that the phone was part of a faulty phone system and therefore having to use the phone violated his due process rights. *In re A.C.*, 354 Ill. App. 3d at 804. However, the court found that use of a telephone, as an alternative to an in-person hearing, was one method authorized by the appellate court to allow for participation in juvenile proceedings. *Id.* at 805; see also *In re C.J.*, 272 Ill. App. 3d 461, 465 (1995) (providing alternatives to a parent's presence at a hearing).

¶ 56 Here, just as in *A.C.*, an alternative method was available, and the court twice confirmed that it would allow Dallen to participate virtually. The court's offer was consistent with precedent

20

as well as Illinois Supreme Court Rule 241, which provides that the court "may, upon request or the judge's own order, allow a case participant to testify by video conference for good cause shown and upon appropriate safeguards." Ill. S. Ct. R. 241(b) (eff. Feb. 2, 2023). Respondent, as the minor's biological parent, would be a "case participant." *Id.* Further, the committee comments clarify that a "showing of good cause and compelling circumstances may rise when a witness is unable to attend trial for unexpected reasons, such as accident or illness, but is able to testify from a remote location." *Id.*, Committee Comments (rev. Feb. 2, 2023). Here, we find nothing in the record that would undermine reliance on Rule 241 to allow Dallen to participate virtually for the fitness hearing due to his incarceration in Tennessee.

¶ 57    Although Dallen's counsel was provided an opportunity to make the arrangements that would allow his client to participate during the hour and 15-minute break before the 1 p.m. hearing, at no time did counsel provide any further information as to why Dallen would not be appearing virtually from the Tennessee jail. Nor was any argument presented as to why a continuance could not be requested in Dallen's criminal case, or why a continuance was not previously requested for the fitness hearing, when the hearing was set over a month earlier and Dallen was in jail for two weeks prior to the fitness hearing. Accordingly, we find that the substituted procedural safeguards—seen here in the offer of an alternative appearance procedure—sufficiently minimized any risk associated with the trial court's denial of counsel's motion for a continuance and therefore, this factor does not weigh in Dallen's claim that his due process rights were violated.

¶ 58    The final *Mathews* factor for consideration is the governmental interest. The court in *C.J.*, noted that "delay in adjudication impose[d] a particularly serious cost on governmental functioning" when the child was "very young." *In re C.J.*, 272 Ill. App. 3d at 466. The statement in *C.J.* cited a Connecticut juvenile case which further stated that "[t]ime is of the essence in child

21

custody cases" because it was public policy of that state "to provide all of its children a safe, stable nurturing environment." (Internal quotation marks omitted.) *In re Juvenile Appeal*, 187 Conn. 431, 439-40 (1982). Connecticut public policy is similar to Illinois public policy. See 705 ILCS 405/1-2(1) (West 2022). However, Illinois does not qualify its public policy based on the age of the child. *Id.*

¶ 59 In the case at bar, Dalton was removed from his parents on April 7, 2020. At the time of the fitness hearing on May 16, 2023, Dalton had been in substitute care for over three years—from age 7 to age 10—waiting for his fate to be decided. Neither Dallen, nor his counsel, provided any time frame as to when Dallen might have been able to participate in person, or virtually. Indeed, no time frame for the requested continuance was ever provided by Dallen's attorney.

¶ 60 While further delay would not likely have personally affected either the State or the trial court, both have "concurrent powers and responsibilities that are in the nature of *parens patriae*." *In re D.S.*, 198 Ill. 2d 309, 328 (2001). "The doctrine of *parens patriae* 'represents an expression of the general power and obligation of the government as a whole to protect minors and the infirm.' " *Id.* (quoting *In re S.G.*, 175 Ill. 2d 471, 488 (1997)). "The *parens patriae* power is codified in the Juvenile Court Act, which specifically charges the circuit court with the duty to act in the best interests of the minor and for the minor's own protection." *Id.* "[B]oth the court and the State's Attorney are jointly charged with acting in the best interests of the minor." *Id.* at 325 (citing *In re J.J.*, 142 Ill. 2d 1, 11 (1991)).

¶ 61 It is well established in Illinois that " 'it is not in [a minor's] best interests for his status to remain in limbo for an extended period of time.' " *Id.* at 328 (quoting *In re D.L.*, 191 Ill. 2d 1, 13 (2000)). The courts "should 'consider, in an expedited manner, cases involving [such children], so that the minors whose futures are at stake in [juvenile] proceedings can obtain a prompt, just, and

final resolution of their status.' " *Id.* (quoting *In re D.L.*, 191 Ill. 2d at 13). Here, continuing the hearing frustrated the State's *parens patriae* interest in promoting the welfare of the child because the delay frustrated Dalton's interest in finding a permanent home (see *In re Charles A.*, 367 Ill. App. 3d 800, 803-04 (2006)) especially where, as seen here, Dalton was in substitute care for over three years and no definite date of availability was provided by respondent. Accordingly, we find, after consideration of the governmental interest, this factor weighs heavily against Dallen's claim of a due process violation.

¶ 62                                    III. CONCLUSION

¶ 63    After consideration of all the *Mathews* factors, we find that Dallen's due process rights were not violated by the trial court's denial of his motion to continue the fitness hearing due to his incarceration in another state. Dallen raised no other issue on appeal. Accordingly, we affirm the trial court's termination of Dallen's parental rights.


¶ 64    Affirmed.